Estate of Kalman Bernstein, Deceased, Lillian Bernstein, Executrix v. Commissioner.Estate of Bernstein v. CommissionerDocket No. 50422.United States Tax CourtT.C. Memo 1956-260; 1956 Tax Ct. Memo LEXIS 34; 15 T.C.M. (CCH) 1366; T.C.M. (RIA) 56260; November 21, 1956Harry G. Taylor, Esq., Roper Building, Miami, Fla., and George H. DeCarion, Esq., for the petitioner. J. Elton Mitchiner, Esq., and Hugh F. Culverhouse, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the decedent's income taxes and additions thereto for the calendar years 1943 through 1945 as follows: Addition underYearDeficiencySection 293(b)1943$43,874.23$22,584.51194454,469.5727,234.79194559,166.5229,583.26The issues for decision are: 1. Whether the decedent in his returns for the years 1943 to 1945, inclusive, understated his taxable income derived from retail jewelry operations in those years under the name K. Burns & Son and, if so, in what amounts. 2. Whether the percentages*35 of gross profit applied by the Commissioner to the cost of merchandise sold by K. Burns & Son during the taxable years in issue properly reflected K. Burns & Son's gross income from jewelry sales and operations for those years. 3. Whether the income from the omitted sales by K. Burns & Son for the above years, if any, was entirely that of the decedent and, if not, to what extent. 4. Whether the decedent's payments in 1948 and 1951 on deficiencies in retail dealer's excise taxes determined by the Commissioner to be due from K. Burns & Son for the calendar years 1943 through 1945, inclusive, were deductible from said business' gross income for the years in issue. 5. Whether any part of the decedent's deficiencies, if any, for each of the years 1943 through 1945, inclusive, was due to the decedent's fraud with intent to evade tax. Findings of Fact The petitioner is the estate of Kalman Bernstein, deceased. Lillian Bernstein, the duly appointed, qualified, and acting executrix, resides in Miami Beach, Florida. The decedent, who died on January 21, 1953, was a resident of the State of Florida in the years involved herein, 1943 through 1945, and his returns for the period in issue*36 were timely filed with the collector of internal revenue for the district of Florida. Prior to the year 1938 the decedent, Kalman Bernstein, (sometimes known as K. Burns) engaged in the operation as the sole proprietor of a retail jewelry business in the name of "K. Burns & Son" at Newark, New Jersey. Before coming to Miami, Florida, in 1939 Maurice Bernstein, the son of the decedent, owned and operated a retail jewelry store at Bayonne, New Jersey. In January 1938 the decedent opened a retail jewelry store at 201 Laura Street, Jacksonville, Florida, in the name of K. Burns & Son, and from that time through December 31, 1945, this store was operated by a separate manager, L. W. Karsman, under the direction and supervision of the decedent. In 1939 a retail jewelry store was rented at 114 E. Flagler Street, Miami, Florida, in the name of K. Burns & Son by the decedent, and from the latter part of 1942 until June 30, 1944, K. Burns & Son also operated a retail jewelry store at 38 N.E. 1st Avenue, Miami, Florida, known as "Simpsons", which store was also in charge of a separate manager. From January 1, 1943, until June 30, 1944, when Simpsons was sold, K. Burns & Son operated the*37 three retail jewelry stores in Florida, and from July 1, 1944, through December 31, 1945, it operated the first two stores mentioned. The decedent had no other known business interests outside of the three jewelry stores. During the period from January 1, 1943, through December 31, 1945, each manager of the Jacksonville store and Simpsons kept separate sales books and rendered periodic accounting reports to the decedent at the Miami store located at 114 E. Flagler Street. Such accounting reports were in the form of bank deposit slips and other memoranda of the daily receipts and authorized disbursements made therefrom by the respective managers. The journal and ledger of K. Burns & Son for the calendar years 1943, 1944, and 1945 were prepared by a certified public accountant (now deceased) by posting from daily sales slips, cash register tapes, bank deposits, cancelled checks, and other memoranda and data furnished by the decedent for those years. Partnership information returns of income (Forms 1065) were timely filed in the name of K. Burns & Son with the collector of internal revenue for the district of Florida, Jacksonville, Florida. These returns contained the combined reported*38 incomes of the retail jewelry stores in Florida for each of the calendar years 1943 to 1945, inclusive. One-half of the reported income disclosed in each of these returns was shown as having been distributed or distributable to the decedent and one-half to his son Maurice, who from September 1942 until October 1945 was a member of the Armed Services of the United States. The partnership returns of K. Burns & Son for the years 1943 through 1945, inclusive, reported the following: Item194319441945Gross receipts$270,225.84$261,989.47$275,460.51Cost of goods sold181,739.40173,737.05178,791.34Gross profit$ 88,486.44$ 88,252.42$ 96,669.17Deductions61,052.3268,574.0667,648.00Net income$ 27,434.12$ 19,678.36$ 29,021.17Capital gain493.02 *5,171.84 **Distribution: DecedentOrdinary Income$ 13,717.06$ 9,839.18$ 14,510.58Capital Gain246.512,585.92MauriceOrdinary Income$ 13,717.06$ 9,839.18$ 14,510.59Capital Gain246.512,585.92On all three returns it was indicated that each had been prepared on the accrual basis. *39 The decedent's income tax returns for 1943 through 1945 reported the following income: 194319441945K. Burns & Son$13,717.06$10,085.69$14,510.58Other income( 435.55)20.564,893.11$13,281.51$10,106.25$19,403.69The decedent's income tax returns for these years disclosed no income from jewelry operations other than that shown as distributable to him on the partnership returns filed in the name of K. Burns & Son. The decedent was well versed in the jewelry business. However, he had come to the United States when he was 12 years old and had no education other than religious training and schooling which amounted to the equivalent of approximately the third or fourth grade. He could read and could write a little in Yiddish and he could read but he could not write in English except to sign his name, write figures, and certain initials which he used as symbols. He dictated letters to a stenographer and called on others to write up sales tickets. The decedent had the reputation of being hard to sell, that is he bought as cheaply as possible. He was known in the jewelry trade as operating a cut-rate store which meant that he did not always*40 conform to the pattern of sales prices set by the better class of jewelry stores. He operated what was considered the lowest type of jewelry store. Often the sales price which he received for an article was determined after bargaining with the customer. The premises for the second Florida store, the one at 114 East Flagler Street, Miami (hereinafter called the Flagler store), opened in 1939, were secured by the decedent who made all the arrangements necessary to commence business before Maurice arrived to take active charge of the management. Merchandise was sent to the Flagler store from both the decedent's store in Newark and Maurice's store in Bayonne, New Jersey. These stores had been separately operated by the decedent and his son but, due to the former's greater knowledge of the jewelry business, the decedent had selected the merchandise for both stores although Maurice paid for the portion of the goods delivered to the Bayonne store. After the Flagler store was opened, Maurice did some local buying to save shipping costs. He had a manager in his Bayonne store between 1939 and 1942 and divided his time between this store and the Flagler store. The decedent moved to Miami*41 in 1942 to take over the Flagler store because Maurice's induction into the military service was then imminent. Maurice was inducted into the army on September 1, 1942, and went on active duty on September 15, 1942. He continued to run his Bayonne store and to work in the Flagler store until almost the day of going into service. He then sold his fixtures in the Bayonne store as well as his accounts receivable but shipped his inventory to the two Miami stores. From time to time, during his military service, as he obtained leave and while stationed nearby, Maurice helped in the Flagler store but, since he was in uniform, he could not get behind a counter. He was overseas from June 1943 until June 1945. The books of account and records of K. Burns & Son during the years 1943 to 1945, inclusive, consisted of a general ledger and, for each of the stores, a combined cash receipts and sales journal, a cash disbursement journal and supporting records, such as duplicate deposit slips, sales slips, cash register tapes, date books, and memorandum excise tax books. The system of bookkeeping used by the decedent during the above years was an acceptable and proper system, one that was then in*42 current use for a business of the type he conducted and was adequate to reflect the income, if properly kept. During the years in issue, the decedent supervised and controlled the records and the management of all the operations of K. Burns & Son. The income of K. Burns & Son, as reported on its partnership returns for the years in issue, coincided with the books and records for those years. An examination of the books would not, however, have revealed any income that might have been received and not recorded. The decedent maintained a personal bank account with American National Bank of Miami and a business bank account in the name of K. Burns & Son with The First National Bank of Miami during the years in issue. The decedent's jewelry operations were on a strictly cash basis. There were only a few instances of sales to preferred customers on an open account. The merchandise in his stores had the cost prices marked on tags in code, and in a few instances the sales prices were so marked. Sometimes both prices were indicated. The indicated selling prices, which were usually double the cost prices, were not always adhered to and, if there was a satisfactory profit margin, the decedent*43 often authorized his clerks to make a sale below the indicated price after the matter had been referred to him. There was frequent bargaining between the customers and the decedent over prices. During the war years, jewelry manufacturers established quotas for their old customers in order to allocate their reduced production, but the decedent had no quotas for standard merchandise and he had difficulty obtaining such wares. He, therefore, sold merchandise brought down from the New Jersey stores and put in clean, salable condition, as well as lesser-known lines and imported items. Some of the merchandise brought down from New Jersey was damaged in a fire and was not covered by insurance. It was cleaned up and sold at prices lower than it otherwise would have been. Under ordinary circumstances, a cash business jeweler is under greater pressure to sell at a lower profit margin than a credit jeweler because of competition and the fact that the customer is in a position to make his purchase without the necessity of obtaining financing. However, during the war years, 1943 through 1945, jewelry was easier to sell and the customary mark-up prices were usually received. There were one*44 or two other jewelers who did a cash business on the same block as the Flagler store and about six who did a credit business. One nearby jeweler who did primarily a credit business but made some sales for cash had a profit margin of approximately 40 per cent, covering all types of merchandise. The margin of gross profit shown on the partnership returns for each of the years 1942-1946 was as follows: YearPer Cent of Sales194233.05194332.75194433.69194535.09194633.90On June 10, 1945, B. W. Brown purchased a watch from K. Burns & Son's Flagler store, and gave the decedent a check for $240 in payment. On or about December 20, 1945, Brown, while in the store on another matter, was told by decedent that he had been questioned about the purchase by an internal revenue agent. The decedent thereupon prepared a memorandum which stated that the decedent had cashed the $240 check for Brown as an accommodation and that no purchase had been made. He gave the memorandum to Brown suggesting that he rewrite it and forward it to the Internal Revenue Bureau, but Brown destroyed it upon returning home. The eleven checks described below given to K. Burns & Son*45 in Miami by its customers for retail purchases of jewelry merchandise were endorsed by the decedent and/or his employees and cashed at the First National Bank of Miami, but none of them can be specifically identified on the books and records of the firm: DateDateCustomerPurchasedCashedExplanationAmountAlbert E. Redlhammer11-12-4411-13-44Diamond ring$ 300Albert E. RedlhammerDec. '442- 5-45Sales price of diamond ring$2160Less: Trade-in allowance800Balance1360Albert E. RedlhammerDec. '442-15-45Diamond ring1300Albert E. Redlhammer3- 5-453- 5-45Gold guard ring177E. G. Roesser3-23-453-23-45Diamond ring1100Grace M. Leitch7-26-457-27-45Diamond ring595Mrs. Georgiana M. Roderick3-26-453-26-45Diamond bracelet2300George J. Labo2-20-452-21-45Lady's wrist watch532Mrs. L. T. Bowles3-27-453-27-45Lady's wrist watch149Florence D. Ricou2-14-452-14-45Diamond ring - bill sale$ 950Trade-in allowance450Balance500Inez G. Davison4- 7-454- 9-45Diamond pin1550A check dated April 19, 1945, in*46 the amount of $3,000 was given by Inez G. Davison to K. Burns & Son in Miami for the retail purchase prices of diamond rings. This check was negotiated to Louis F. Guiness, Inc. A credit to a separate consignment merchandise account on the latter's books to the account of K. Burns & Son was made on April 21, 1945, in the amount of $3,000. A check dated September 12, 1945, in the amount of $1,885 was given by Lillie Mandis to K. Burns & Son, Miami, as payment of the retail purchase price of a lady's wrist watch in the amount of $2,235 less a trade-in allowance of $350. While the records of K. Burns & Son show a sale of $1,885, no entry was made with respect to the trade-in. The following unexplained bank deposits were made by the decedent in his personal checking account with the American National Bank, Miami, during the years in issue, the sources of which have not been identified: Calendar Year 1943Deposit DateAmountDescription of Items11- 2-43$ 2,500.00Account opened - not identified11-23-43575.00Currency11-26-43150.00Currency11-26-43450.00Currency11-26-43325.00Currency12- 1-432,981.00Currency$2,600.00* Check (4-day hold)$ 381.0012- 4-43475.00Currency12-17-436,800.00Currency12-23-431,000.00CurrencyTotals$15,256.00Calendar Year 19443-21-44$ 1,175.00CurrencyCurrency$2,060.00Silver3.31U.S. Treas. check236.693-31-44370.00Currency4- 7-44500.00Currency297.00U.S. Treas. check203.004-17-44945.00Currency4-19-44615.00Currency4-25-44234.52Windsor Hotel check100.00* Check (1-day hold)75.26Detroit check59.264-27-44600.00Currency4-29-44900.00Currency5- 9-44500.00Currency5-12-44220.00Currency$ 170.00* Check (6-day hold)50.005-23-44500.00Currency34.82U.S. Treas. check56.56U.S. Treas. check51.31U.S. Treas. check49.48U.S. Treas. check41.82U.S. Treas. check52.45Rollings Garage check61.04F. W. Nay check50.00Burroughs Add. Mach. Co.54.30* Check (3-day hold)48.227-10-44275.00No descriptionTotals$ 9,134.52Calendar Year 19452-17-45$ 1,335.96* Check (10-day hold)4-10-451,275.00Currency5-24-45750.00Currency6- 6-453,000.00Currency and silver$2,800.39* Check (4-day hold)42.65U.S. Treas. check56.96U.S. Treas. check100.00Totals$ 6,360.96*47 The decedent also made the deposits described below in his personal checking account, but none of these sales and receipts can be specifically identified on the books and records of K. Burns & Son: Date ofDepositSource and Explanation12- 1-43Two checks in the amounts of $332.71and $343.08 dated 11-29-43 and 12-1-43,respectively, made by David Urbach,a wholesale novelty salesman, payableto K. Burns & Son in payment ofnovelty merchandise purchased.4-25-44Two checks in the amounts of $212.50and $79.02 dated 4-22-44 made by Mrs.Lottie E. Spencer payable to K. Burns& Son for the retail purchase of aman's diamond ring and a set of goldguard rings. Also one check in theamount of $140.00 made by Mrs. L. E.Clerk payable to K. Burns & Son for aretail purchase of jewelry.5-12-44One check in the amount of $500.00dated May 10, 1944 made by Jacob C.Chutkow payable to K. Burns & Sonfor the balance due on the retail pur-chase of a lady's diamond ring, thesales price being $3,500.00 which waspaid as follows: Allowance for 2 diamond ringstraded in $2,000.00Check herein stated 500.00The balance of $1,000.00 was paid bycheck of Jacob C. Chutkow in June,1944, payable to K. Burns & Son, thedisposition of the same by the latterremaining unexplained or unidentified.4-25-44One check dated April 22, 1944, madeby C. R. Alford payable to K. Burns& Son for $350.00 in payment of theretail purchase price of a diamondring purchased from the latter on thedate of said check.4-20-44On April 20, 1944, E. G. Roesser madea retail purchase of a diamond ringfrom the petitioner at K. Burns &Son on 114 E. Flagler Street, Miami,Florida, the price being $1,000.00 paidby check dated the same day drawnon the Broward Bank & Trust Com-pany, Ft. Lauderdale, Florida.*48 Toward the end of December 1945, Jacob Chutkow purchased a $5,500 ring from the decedent in his Flagler store. He offered a $3,000 check in part payment, but the decedent refused to take it and sent one of his salesmen with Chutkow to the bank to have it cashed. Decedent then accepted a 60-day note in payment of the $2,500 balance. When Chutkow was ready to pay the note, he informed Maurice, who refused to take a check, but sent one of the salesmen to the bank with Chutkow who thereupon paid off the note in currency. Chutkow did not receive any bill of sale or other memorandum of his purchase. In or about December 1944 Hugh Lalor purchased two diamonds and a wedding band from the decedent for $2,450 cash, plus the trade-in value of two stones. Pursuant to the decedent's request, Labor paid for the rings in currency. David Urbach purchased merchandise from the decedent and paid him by checks as follows: DateAmount12-31-42$249.401-15-43273.501-23-43212.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.902-20-43183.904-20-43314.3012- 1-43343.0811-29-43332.71The cash receipts journal of K. Burns & Son failed to show that these eight checks were recorded. On one or*49 two occasions, the decedent asked Urbach to cash his check at a bank and to bring him the currency. After the decedent moved to Florida and as Maurice was preparing to enter the army, the father and son had a discussion with respect to the business and the decedent said: "Son, don't worry. I'm going to run the business. When you come back we will go on it together." They also had some discussion as to the division of profits. During his period of army service, Maurice did not receive any regular salary or profit from the business, but was sent funds by his father from time to time for particular purposes. On March 14, 1946, the decedent signed and personally delivered the following letter to his son: "For many years you and I have been partners in various transactions and in the operation of jewelry business located at 114 East Flagler Street, Miami, Florida, and 201 Laura Street, Jacksonville, Florida, both of which stores are operated under the name of K. Burns & Son. "We have never had formal, written partnership agreements executed between us, and, for that reason, I am giving you this letter so that there can be no misunderstanding by anyone regarding your rights and*50 interests as my partner. "This letter, therefore, is to confirm the fact that you and I are equal partners in the transactions and the business described above. "At a later, more convenient time, we shall execute written partnership agreement." This letter was prepared at the suggestion of an attorney who was a personal friend and had represented the decedent on various matters for several years prior to 1946. The attorney has heard the decedent refer to Maurice on several occasions as his son and his partner. He inquired of the decedent if he had ever executed any written document confirming the fact that he and his son were partners and, upon being told that the decedent had not, be advised him to execute at least a letter in which Maurice's interest in the business would be set forth. The decedent never conferred with this attorney about a will. At the time that this letter was executed, the decedent's returns for 1943 and 1944 were being audited by internal revenue agents. When Maurice returned from the army in 1945, the decedent introduced him to friends as his "new partner." In 1951, prior to the execution of his will on August 31, 1951, the decedent was a very sick*51 man and there was friction between him and his son over a woman Maurice wished to marry and whom he did marry about a year after his father's death. Paragraph FIFTH of the decedent's will, admitted to probate by the Probate Court of Dade County, Florida, provided in part as follows: "FIFTH: I am the sole owner of the business operated under the name of K. BURNS & SON and although I have used the name K. BURNS & SON, there is no son, or anyone else having an interest in the business other than myself, and the business owned and operated by me under the name of K. BURNS & SON, at the address 114 E. Flagler Street, Miami, Florida, and with full right to continue the use of the name K. Burns & Son, I give, devise and bequeath as follows: * * *" The disposition of the business provided by the decedent was 75 per cent to his wife and 25 per cent to his son Maurice in the event he did not marry a person who met with the disapproval of his three sisters. In the event he married such a person, the 25 per cent went to his mother and his entire bequest under the will would be $10. It was further provided that Maurice could buy out his mother's 75 per cent at the inventory cost value, and*52 that if he failed to do so, she could buy his 25 per cent on the same basis. Up to the time of the hearing, Maurice had not instituted any proceeding in connection with his father's estate or will relating to the business of K. Burn's & Son. The general ledger of K. Burns & Son showed a combined drawing account for the decedent and his son Maurice and the payments to each were not segregated. The balances in the respective capital accounts of the decedent and his son at the end of the years 1943 through 1945 were as follows: YearDecedentMaurice1943$ 8,763.50$ 8,763.50194456,289.8516,463.85194556,760.7216,934.73Maurice's income tax return for 1951 was audited and his income was increased because "the net income for the partnership of K. Burns & Son (Retail Jewelers) [had] been increased." The estate tax return filed on behalf of the decedent's estate reported as an asset "one half interest in the assets of K. Burns & Son, partnership." The decedent in 1946 furnished the internal revenue agent assigned to audit his 1943-1945 returns with the books of his business consisting of a general ledger, and cash receipts and disbursements*53 journal, a tax book, and a daily cash book, plus some cancelled checks and bank statements for about one year, and a card containing duplicate sales slips, cash register tapes for a period of six to eight months. A few other memoranda for the year 1945 were also submitted. Additional supporting memoranda were requested by the agent, but the decedent told him the balance of the records had been lost in a storm while stored in his garage. No purchase invoices were furnished the agent although he requested them. In December of 1945, the decedent furnished the agent with a financial statement, and similar statements were also submitted by his wife and son. The agent, in addition to examining the decedent's books and records, also examined bank records and made other inquiries from leads he received. The agent was unable to obtain an explanation from the decedent and his accountant of the bank deposits described above. Although the agent attempted to prepare a net worth statement with respect to the years in issue, he found it impossible to develop a starting point and abandoned the attempt. An attempt to determine the decedent's income through the bank deposit method was also abandoned*54 due to the number of customer's checks cashed and the inability of the agent to identify the source of a number of deposits. The agent, therefore, used the percentage-of-gross-profit-on-sales method to determine the decedent's income. The respondent determined that the margins of gross profit on retail sales (exclusive of Federal excise taxes) realized by K. Burns & Son for the years in issue were as follows: 194345%194448%194548% He accepted the reported figures on the firm's cost of goods sold and by applying the above percentages thereto recomputed the amount of retail sales for each year and determined the amount of additional income from omitted sales. The percentages of gross profit were determined after respondent's agents had interviewed several jewelers and an accountant who represented a number of jewelers. During each of the years 1943 through 1945, inclusive, K. Burns & Son realized a gross profit of 37 1/2 per cent on retail sales exclusive of Federal excise taxes. Although the deficiency notice referred to "the partnership of K. Burns & Son" and the answer refers to "the partnership known as K. Burns & Son", all of the additional income*55 from the omitted sales was determined by respondent to have been diverted and retained by the decedent and all of it was added to his income and none to Maurice's income for the years in issue. The books of account of K. Burns & Son were kept in a manner having features of both the cash method and the accrual method of accounting. As a result of a determination by the Commissioner of Internal Revenue of deficiencies in retail dealer's excise taxes as being due from K. Burns & Son for the calendar years 1943, 1944, and 1945, the decedent made such additional tax payments for each of those years in 1948 and 1951 in the amounts as follows: 1943$ 2,051.2319448,083.28194512,079.48The partnership returns of income filed in the name of K. Burns & Son for the calendar years 1943, 1944, and 1945 do not include in the merchandise sales and receipts appearing therein any retail dealer's excise tax collected or charged, nor is there included therein any deduction for payments or accrual of said taxes. A claim for refund of an unspecified part of the excise taxes paid by the decedent for the years 1943 through 1945 was pending at the time of the hearing. The*56 decedent omitted at least the following amounts from his reported income for the years in issue: YearAmount1943$17,218.19194412,716.04194515,923.96Part of the decedent's deficiencies in income tax for each of the years 1943 through 1945, inclusive, was due to fraud with intent to evade tax. The stipulation of facts and the exhibits annexed thereto are incorporated herein by this reference. Opinion KERN, Judge: The various issues herein are discussed below under their respective headings. Understatement of Income The first issue presented for decision is whether or not the decedent in his returns for the years 1943 through 1945 understated his taxable income from the retail jewelry business operated under the name K. Burns & Son and, if so, in what amounts. The resolution of this question necessarily involves a decision as to whether, under the circumstances herein, the respondent was justified in rejecting the firm's books and records as inadequate and inaccurate and in reconstructing its retail sales income by the method of percentage of gross profit on sales and a further decision as to whether the percentages of gross profit applied by*57 the respondent in making his determination for the years in issue properly reflected the firm's income for those years. Persons subject to Federal taxation are required to keep such accounting records, including inventories when sales of merchandise are an income-producing factor, as will enable them to determine and report their true income. Regs. 111, Sections 29.41-3, 29.54-1. If the method of accounting employed does not clearly reflect the income, the respondent is authorized to use such method as, in his opinion, does clearly reflect the income. Section 41, Internal Revenue Code of 1939. If the respondent, upon the audit of a taxpayer's return, finds that the latter's records are incomplete, inaccurate, or otherwise unsatisfactory, he need not accept the filed return as complete and may seek elsewhere for such information as he requires. Louis Halle, 7 T.C. 245, affd. (C.A. 2, 1949), 175 Fed. (2d) 500, certiorari denied 338 U.S. 949. The petitioner argues that the use of the gross-profit-percentage method by the respondent is unjust, oppressive, and arbitrary on the grounds that (1) an adequate system of books and records installed*58 and supervised by a certified public accountant was in operation in which all but a few omitted items were recorded, (2) there is no evidence of falsification of the books or that they are so incomplete or inaccurate as to be disregarded, (3) there is no evidence of an increase in the net worth of the decedent or his family during the taxable years. The stipulation of facts and the testimony establish, and we have found that during the years 1943 through 1945 the following amounts were either unexplained deposits in the decedent's personal checking account or sales of jewelry merchandise by K. Burns & Son, which were not recorded on its books: 1943$17,218.19194412,716.04194515,923.96The above totals were derived as follows: YearsItem194319441945Unexplained deposits in decedent's per-sonal checking account$15,256.00$ 9,134.52$ 6,360.96Unrecorded sales249.40300.001,360.00273.50212.501,300.00212.4079.02177.0052.90140.001,100.00183.90500.00595.00314.301,000.002,300.00343.08350.00532.00332.711,000.00149.00500.001,550.00Totals$17,218.19$12,716.04$15,923.96*59 In the absence of explanation or proof to the contrary, unidentified deposits in a checking account normally will be considered as constituting income. Goe v. Commissioner, (C.A. 3, 1952), 198 Fed. (2d) 851, certiorari denied 344 U.S. 897. Petitioner makes no contention that the addition of the unexplained deposits to the unrecorded sales might result in the duplication of items of income. The foregoing amounts represent between one-half and two-thirds of the net income of K. Burns & Son for each of the years in issue, and indicate the existence of a substantial degree of inaccuracy in its books and records. Furthermore, the only underlying records which the decedent could furnish the internal revenue agents who were auditing his books for the three-year period were some cancelled checks and bank statements covering a period of about one year and some duplicate sales slips and some cash register tapes covering a period of six to eight months. The testimony of the certified public accountant called by the petitioner was only to the effect that the bookkeeping system employed was adequate for the business, if properly kept. It is obvious from the size of*60 the amounts omitted that such system was not properly kept and in the absence of evidence as to its completeness and accuracy, the respondent was justified in turning to other methods to compute the decedent's income. Louis Halle, supra.One such method available to the respondent in computing a taxpayer's income when his books are inadequate and the taxpayer's business consists of the sale of merchandise is the percentage-of-gross-profits method. Decker v. Korth, (C.A. 10, 1955) 219 Fed. (2d) 732; Hyman B. Stone, 22 T.C. 893; G. E. Fuller, 20 T.C. 308, affd. (C.A. 10, 1954), 213 Fed. (2d) 102; Maurice Cross, 24 B.T.A. 1079. It is not a prerequisite to the use of this method that the respondent prove the impossibility of the use of the so-called net worth or bank deposit methods of reconstructing a taxpayer's income. Any one of these methods, or a combination of them, is available to respondent when the books of the taxpayer do not clearly reflect his income, and the use of any one of these methods in the case of a taxpayer engaged as decedent was in the sale of merchandise is justified by proof that*61 his income is not clearly reflected by his books. Having concluded, for the reasons stated, that decedent's income for the taxable period was not clearly or correctly reflected by his books, it follows that respondent was justified in his use of the percentage-of-gross-profits method in reconstructing decedent's income, and that his use of that method was not arbitrary within the rule of Helvering v. Taylor, 293 U.S. 507. However, the question remains as to whether this method was correctly applied under the facts of the instant case, and, particularly, whether the percentages of gross profit used by respondent (45 per cent and 48 per cent) were correct. The petitioner adduced no evidence of specific sales to prove that the percentages used by the respondent were excessive. However, there was testimony, part of it by the son of the decedent, to the effect that K. Burns & Son often sold merchandise below the indicated mark-up on sales. There was countering testimony adduced by the respondent to the effect that during the war years merchandise was easy to sell and that the customary mark-ups were obtained. After careful consideration of the entire record, we have concluded*62 that the evidence therein establishes that the rates determined by the respondent were too high for the business of K. Burns & Son and that a percentage of gross profit to retail sales (exclusive of Federal excise taxes) of 37 1/2 per cent in each of the years in issue properly reflects the retail sales income for those years. Partnership Having determined that the income of K. Burns & Son was understated for the years 1943 through 1945, we must next decide whether all of the omitted income was that of the decedent or whether part of it was the income of his son and purported partner, Maurice. Our principal difficulty with regard to this question is caused by the ambiguity of respondent's position in dealing with it. Both the deficiency notice and the answer recognize the existence of a partnership between decedent and his son and the right of the son to that one-half of the partnership income shown on the partnership returns as distributed or distributable to the son. Respondent's determination is that the income from the omitted sales of the partnership "represents income which was diverted and retained by [the decedent]" and is, therefore, his taxable income. However, on*63 brief, respondent argues that there was no real partnership existing during the taxable years between decedent and Maurice and, therefore, the "income from the operation of K. Burns and Son belonged to decedent alone." In view of the deficiency notice and the pleadings, we are of the opinion that this argument of respondent cannot be properly advanced on brief. If respondent in his answer had stated this position, which was at variance with that stated in his deficiency notice, the burden of proof would have been on respondent with regard to this issue. On the record before us, we would be in doubt as to its resolution. However, as we have already indicated, we do not consider that the question is before us. Therefore, we assume the existence of the partnership during the taxable years, as the respondent assumed it in his deficiency notice and answer. If we assume the existence of the partnership, we can see no reason for failing to consider it as an "equal" partnership which is in accord with the evidence which substantiates its existence and the returns which it filed. Apparently respondent had the same view and, therefore, felt it necessary to negate the existence of the partnership*64 in order to logically justify the inclusion of the omitted sales in the income of the decedent alone. We conclude that only one-half of the income from the omitted sales for each taxable year is includible in the income of petitioner. Accrual of Excise Taxes The third issue is whether or not the firm of K. Burns & Son kept its books on an accrual basis, and, if so, whether it can accrue in the years 1943 through 1945 Federal excise taxes on retail jewelry sales paid with respect to those years in 1948 and 1951 where a claim for refund of part of such taxes was pending at the time of the hearing. This issue was not raised by the petition nor has any amendment to the petition been filed to plead it. It was first raised by petitioner's counsel in his opening statement at the hearing and no objection was made by respondent's counsel. Thereafter, both counsel addressed themselves to this issue at the hearing and have devoted portions of their briefs thereto. Since this issue was not raised for the first time on brief, see William Greenberg, 25 T.C. 534, and respondent has interposed no objection, we shall deem the pleadings to have been informally amended and shall*65 consider the issue. Arthur C. Ruge, 26 T.C. 138; William C. Baird, 25 T.C. 387. The parties have devoted a great deal of argument to the question of whether the books of account of K. Burns & Son were kept on the cash or the accrual basis. However, even if we were to decide that the books of the firm were kept on the accrual basis as the petitioner contends rather than on the cash basis, we are of the opinion that the petitioner has failed to prove that the firm was entitled to accrue in 1943 through 1945 the excise taxes paid in 1948 and 1951 with respect to those years. There is nothing in the record before us to show why K. Burns & Son did not accrue or pay the taxes in the years 1943 through 1945 nor is there anything in the record that explains either the basis for or the amount of the refund claim pending. We cannot say on the record before us that the firm deliberately chose to avoid these excise taxes. For all we know, the decedent might have had and his executrix might still have, in view of the refund claim, the conviction that the firm was not liable for these taxes, in which event they would not be deductible until paid and then only to that*66 extent. Gibson Products Co., 8 T.C. 654; Chestnut Securities Co. v. United States, (Ct. Cls., 1945), 62 Fed. Supp. 574. Fraud At the outset of our consideration of this point, we deem it necessary to comment upon the testimony of the manager of the Jacksonville store, L. W. Karsman, and to state that we have given no credence to it and that our decision on this issue is in no way based upon it. Karsman testified to the effect that during the years in issue herein he and the decedent were engaged in a "side diamond" deal whereby the decedent sent him loose diamonds and he, Karsman, purchased such good diamond buys as he could find, which diamonds were sold for cash without being recorded on the store's books. According to Karsman, he and the decedent equally divided profits amounting to approximately $10,000 each a year. Karsman's bank statements show many thousands of dollars of deposits above his $75 a week salary and 2 1/2 per cent commission on the store's sales. He did not originally report this income on his tax return but made a voluntary disclosure in November 1948. We have carefully considered this testimony and for the following reasons*67 have rejected it. Karsman was not authorized by the decedent to make purchases for the store, and it does not seem probable that he would be authorized to buy diamonds in such a deal. The risks of such an enterprise were great and it does not appear reasonable that the decedent, at his relatively low tax brackets, would take such risks of civil and criminal penalties and divide one-half the profits with an accomplice. There are several letters from Karsman to the decedent in which the manager pleaded with and dunned the decedent for his commissions in order to meet personal obligations. This was an annual ordeal for Karsman. It does not appear logical to us that Karsman would have resorted to these letters if he had large amounts of illicit profits belonging to the decedent in his possession, nor do we believe the decedent would have ignored Karsman's demands for his commissions if he was engaged in an illegal venture with him. The bank statements establish that large sums were deposited by Karsman but they do not, in view of the above, establish to our satisfaction that the monies represented profits from a side deal with the decedent. Upon a consideration of the entire record, *68 however, with the exception above noted, we are of the opinion that the respondent has met its burden of proving by clear and convincing evidence that a part of the decedent's deficiencies in each of the years in issue was due to fraud with intent to evade tax. The evidence shows and the petitioner, with minor exceptions, concedes on brief that at least the following amounts of income were not reported by the decedent: 194319441945Unexplained bank deposits$15,256.00$ 9,134.52$ 6,390.96Omitted sales1,962.193,581.529,533.00Unreported income$17,218.19$12,716.04$15,923.96Reported income$13,281.51$10,106.25$19,403.69These amounts, considered alone, represent the following approximate percentages of the decedent's reported income for the years in issue: 1943130%1944126%194582%We have not included in our consideration of this issue any additional income resulting from the application of the percentage-of-gross-profit-on-sales method because, while we are of the opinion that the evidence in the record before us supports the percentage set forth in our findings for the purpose of determining the deficiencies, *69 we do not believe that such evidence is sufficiently clear and convincing to support the additions for fraud. Sidney Cohen, et al., 27 T.C. (filed October 31, 1956). The passage of large unexplained amounts through a taxpayer's bank account during the years in controversy is substantial evidence to be considered on the question of fraud. Joseph Calafato, 42 B.T.A. 881, affd. (C.A. 3, 1941), 124 Fed. (2d) 187; Russell C. Mauch, 35 B.T.A. 617, affd. (C.A. 3, 1940) 113 Fed. (2d) 555; see also Goe v. Commissioner, supra.The absence of any explanation on the part of the decedent as to the source from which he obtained the amounts deposited, even though questioned by the internal revenue agents with respect to them, points to the conclusion that they represented income. Several of the deposits were in currency of such large amounts that we doubt that petitioner could have forgotten them. If they were gifts or a return of capital, it would appear logical that decedent would have produced evidence of this or at least some explanation. Joseph Calafato, supra.The petitioner, in its brief, has, in fact, tacitly*70 conceded that these deposits do represent unreported income, arguing that their omission was due to decedent's lack of education and to poorly trained and poorly supervised help employed during the war years. Since the decedent's individual and partnership returns show the personal and business deductions claimed by him and the respondent has allowed the full amount of the claimed cost of goods sold as a deduction, even though requested purchase invoices were not produced for audit, we are of the opinion that the deposits may be treated as net income. Petitioner has made no contention or argument to the contrary. In addition to the large sums of unexplained deposits, the evidence before us establishes that a number of sales in substantial amounts were not recorded on the firm's books, and that on one occasion the decedent attempted to induce a customer to give false information to the Internal Revenue Bureau in order to conceal a sale. Such action in connection with an investigation of his returns may be given weight on the question of decedent's fraud. Goe v. Commissioner, supra. The case of Denny York, 24 T.C. 742, is distinguishable. Therein we held*71 that the respondent had failed to sustain his burden of proving fraud because the unexplained bank deposits which were the principal and essential part of his case were held to be not in themselves clear and convincing evidence of fraud. The taxpayer therein, a gambler, testified that he had had gambling losses in excess of winnings and that he had held funds which were not in the bank on the opening date of respondent's computation, testimony which the Commissioner did not disprove. In the instant case, there is no explanation whatsoever as to an alternative source of the deposits although decedent was alive for several years after the period of investigation and, as we have noted, petitioner concedes that the deposits are income. Furthermore, the added factors of decedent's attempt to hide at least one sale from internal revenue agents and the number of sales shown to have been omitted tend to add support to the evidence furnished by the unexplained deposits. While the decedent lacked a formal education and could not write in English, he was intelligent enough to conduct successfully several retail jewelry stores, at least two through managers, and to bargain closely with both*72 suppliers and customers in a highly competitive field. We do not believe that the decedent could have overlooked bookkeeping errors of inexperienced personnel which would have resulted in such a large amount of unreported as against reported income over a period of three successive years. The unexplained receipt of amounts of such actual and relative magnitude over this period of time points to the existence of fraud, and we so hold. Rogers v. Commissioner, (C.A. 6, 1940) 111 Fed. (2d) 987; M. Rea Gano, 19 B.T.A. 518; Estate of Joseph Nitto, 13 T.C. 858; Arlette Coat Co., 14 T.C. 751. Decision will be entered under Rule 50. Footnotes*. Net long-term capital gain. ↩**. Net short-term capital gain.↩*. Denotes the estimated time and distance for clearance of these checks by the American National Bank of Miami from the drawee bank.↩